## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

In Re:                              :   Chapter 9
                                    :
WESTFALL TOWNSHIP,                  :   Case No. 5-09-02736 (JJT)
                                    :
                    Debtor.         :

## DISCLOSURE STATEMENT WITH RESPECT TO
## PLAN FOR THE ADJUSTMENT OF DEBTS
## OF WESTFALL TOWNSHIP, PA, DATED OCTOBER 29, 2009

NOTE: THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125(B) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF ADJUSTMENT OF DEBTS DESCRIBED HEREIN. THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT THEREFORE IS NOT INTENDED AS, AND SHOULD NOT BE CONSTRUED TO BE, A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THAT PLAN OR ANY OTHER PLAN.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

    A.  The Purpose Of This Disclosure Statement.............................................2

    B.  Summary Of Entities Entitled To Vote On The Plan And Of Certain
    Requirements Necessary For Confirmation Of The Plan. ......................................3

    C.  Voting Procedures, Balloting Deadline, Confirmation Hearing, And Other
    Important Dates, Deadlines, And Procedures. ......................................................4

        1.  Voting Procedures And Deadlines. ...........................................4

        2.  Date Of The Confirmation Hearing And Deadlines For Objection To
        Confirmation Of The Plan. .....................................................4

    D.  Important Notice..................................................................................5

    E.  Additional Information. ........................................................................6

II.  BACKGROUND INFORMATION ....................................................................6

    A.  The Township, its Services, Operations and Land Use Planning............................6

    B.  The Township's Operating Budget, Balance Sheet and Long Term Debt ............10

    C.  The Events Precipitating the Chapter 9 Case:  The Katz Litigation......................13

III.  THE TOWNSHIP'S CHAPTER 9 CASE..........................................................16

    A.  Commencement and Administration of the Chapter 9 Case .................................16

    B.  The PA Act 47 Recovery Plan...........................................................19

IV.  THE TOWNSHIP'S FISCAL PLANS FOR THE ADJUSTMENT AND PAYMENT OF
ITS DEBT..............................................................................................................22

    A.  Tax Increases .................................................................................22

    B.  Borrowings to Assist Cash Flow .......................................................22

    C.  Fiscal Initiatives...............................................................................23

    D.  Revenue and Expense Projections 2010-1012.....................................26

V.  SUMMARY OF THE PLAN OF ADJUSTMENT .............................................26

    A.  Classification And Treatment Of Claims. ..........................................27

        1.  Unclassified Claims.................................................................27

        2.  Class 1 – Katz Claims..............................................................29

3. Class 2 – Dime Bank Claim. ........................................................30

4. Class 3 – Pennstar Bank Claims. ...............................................31

5. Class 4 – John Deere Credit Claim. ............................................33

6. Class 5 – Robert A. Dombrosky Claim. .....................................34

7. Class 6 – General Unsecured Claims. ........................................35

B. Treatment Of Executory Contracts And Unexpired Leases. ..................35

1. Generally. .................................................................................35

2. Assumption. .............................................................................36

3. Rejection. .................................................................................37

C. Means For Execution And Implementation Of The Plan. ...................38

1. Cash On Hand, Increased Taxes and Borrowings. .....................38

2. Preservation Of Rights Action. ................................................38

3. Cancellation Of Liens. .............................................................39

4. Authorization. ..........................................................................39

D. Distributions. .......................................................................................40

1. Undeliverable Distributions. ....................................................40

2. Timeliness Of Payments. ..........................................................41

3. Compliance With Tax Requirements. ........................................41

4. Time Bar To Cash Payments. ....................................................42

5. No Distributions On Account Of Disputed Claims. ...................42

E. Disputed Claims. ..................................................................................42

1. Claims Objection Deadline; Prosecution Of Objections. ...........42

2. Reserves, Payments, And Distributions With Respect To Disputed Claims. 43

F. Continuing Jurisdiction Of The Bankruptcy Court ...............................43

VI. CONFIRMATION AND EFFECTiVENESS OF THE PLAN ...........................43

A. Voting And Right To Be Heard At Confirmation. ................................44

1. Who May Support Or Object To Confirmation Of The Plan? ..............44

2. Who May Vote To Accept Or Reject The Plan? .......................44

3. Who is Not Entitled To Vote? ..................................................45

4. Votes Necessary To Confirm The Plan. ....................................45

B. The "Best Interests" Test. .....................................................................46

|   | C. | Feasibility. | | 47 |
|   | D. | "Cramdown." | | 47 |
|   | E. | Effective Date. | | 48 |
|   |    |    | 1. | Conditions To The Occurrence Of The Effective Date. | 48 |
|   | F. | Effect Of Confirmation. | | 49 |
|   |    |    | 1. | Discharge Of The Township. | 49 |
|   |    |    | 2. | Injunction. | 50 |
|   |    |    | 3. | Term Of Existing Injunctions And Stays. | 50 |
| VII. | CERTAIN RISK FACTORS TO BE CONSIDERED | | 50 |
|   | A. | Inability To Raise Tax Revenue. | | 51 |
|   | B. | Reallocation of Revenue Away From The Township. | | 51 |
|   | C. | Inability To Borrow. | | 51 |
| VIII. | CERTAIN TAX CONSEQUENCES | | 52 |
| IX. | RECOMMENDATION AND CONCLUSION | | 52 |

**Exhibit A**     Plan of Adjustment of Debts

**Exhibit B**     Township Fiscal Information and Projections

**Exhibit C**     Schedule of Claims Against the Township ("List of Creditors")

# SUMMARY

The following pages summarize certain important information set forth elsewhere in this Disclosure Statement. Capitalized terms are defined in the text of this Disclosure Statement and in the Plan.

The Disclosure Statement contains important information that is not summarized in this Summary and that may influence your decision regarding whether to accept or reject the Plan or otherwise affect your rights. Please do not rely on this Summary standing alone, and please read all of this document and the accompanying materials thoroughly.

| **Debtor** | Westfall Township, PA |
|---|---|
| **Bankruptcy Court** | United States Bankruptcy Court for the Middle District of Pennsylvania<br>The Honorable John J. Thomas, presiding |
| **Plan** | Plan For The Adjustment Of Debts Of Westfall Township, PA, dated October 29, 2009 |
| **Purpose of the Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors and shareholders known to have claims that are impaired under the Plan. Ballots must be returned to and received by the Ballot Tabulator by no later than 4:00 p.m., Eastern Standard Time, on _____, 2010. |
| **Ballot Tabulator** | Susan Henry, Legal Assistant, Pepper Hamilton LLP, 3000 Two Logan Square, 18th & Arch Streets, Philadelphia, PA 19103 |
| **Confirmation Hearing and Confirmation Objections** | A hearing regarding confirmation of the Plan will be held by the Bankruptcy Court on _____, 2010, commencing at __ Eastern Standard Time. Objections to |

| | |
|---|---|
| | confirmation must be filed and served by no later than _____, 2010. |
| **Treatment of Claims** | If the Court confirms the Plan and the Plan becomes effective, claims will be treated as follows: |
| Administrative Claims | Paid in full. |
| Class 1<br>Katz Claims | Not impaired. |
| Class 2<br>Dime Bank Claim | The Dime Bank will be paid in full, but the term of the loan will be extended by 10 years. |
| Class 3<br>Pennstar Bank Claims | The Pennstar Bank Claims have been or will be paid in full, but the term of the Sherwood Truck Loan will be extended to 9/23/16. |
| Class 4<br>John Deere Credit Claim | Not impaired. |
| Class 5<br>Robert A. Dombrosky Claim | Not impaired. |
| Class 6<br>General Unsecured Claims | Not impaired. |
| **Background Information:** | See pages 7-16 |
| **Questions:** | Please contact the Township's bankruptcy counsel: J. Gregg Miller, Esq. or Leon Barson, Esq., Pepper Hamilton LLP, 3000 Two Logan Square, 18th & Arch Streets, Philadelphia, PA 19103 (phone: 215-981-4000; facsimile: 215-981-4750)<br><br>or<br><br>The Township Solicitor: Robert F. Bernathy, Esquire, Klemeyer Farley & Bernathy, LLC, 2523 Route 6, Suite One, Hawley, PA 18428 (phone: 570-226-5771; facsimile: 570-226-5040) |

## I.    INTRODUCTION

Westfall Township, PA (the "Township"), a Second Class Township, filed a petition under Chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") on April 10, 2009, thereby commencing Case Number 5-09-02736 (JJT) (the "Chapter 9 Case") currently pending before the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Bankruptcy Court"). The primary reason for filing the petition was litigation brought against the Township by David H. and Barbara D. Katz (the "Katzes") which focused on development of two parcels of land (740 acres and 3.4 acres) in the Township. The litigation resulted in a judgment against the Township in the amount of $20,804,484 plus ongoing interest. The Katz litigation has been settled under the protection of the U.S. Bankruptcy Court.

The Township is the proponent of the "Plan For The Adjustment Of Debts Of Westfall Township, PA, dated October 29, 2009" (the "Plan"), a copy of which is attached to this Disclosure Statement as Exhibit A. [The Bankruptcy Court has determined that this Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and has authorized the Township to transmit it to holders of impaired claims in connection with the solicitation of votes with respect to the Plan.][1]

As described more fully elsewhere in this document, the Township believes that the Plan provides the greatest and earliest possible recoveries to holders of claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative restructuring or reorganization would result in delay, uncertainty, expense, litigation and, ultimately, smaller distributions to creditors. Accordingly, the Township **urges that you cast your ballot in favor of the Plan.**

---

[1] Any capitalized term not otherwise defined in this Disclosure Statement has the meaning ascribed to it in the Plan. Unless otherwise indicated, references in this Disclosure Statement to "Sections" are references to the various enumerated Sections of this Disclosure Statement.

## A.    The Purpose Of This Disclosure Statement.

The Bankruptcy Code generally requires that the proponent of a plan of adjustment of debts prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under that plan to make an informed judgment with respect to the plan. This Disclosure Statement provides such information, as well as information regarding the deadlines for casting ballots with respect to the Plan, the deadlines for objecting to confirmation of the Plan, the requirements that must be satisfied in order for the Bankruptcy Court to confirm the Plan, and other relevant information. *Parties in interest should read this Disclosure Statement, the Plan, and all of the exhibits accompanying such documents in their entirety in order to ascertain:*

1.    How the Plan will affect their claims against the Township;

2.    Their rights with respect to voting for or against the Plan;

3.    Their rights with respect to objecting to confirmation of the Plan; and

4.    How and when to cast a ballot with respect to the Plan.

This Disclosure Statement, however, cannot and does not provide creditors with legal or other advice or inform such parties of all aspects of their rights. Claimants are advised to consult with their attorneys and/or financial advisors to obtain more specific advice regarding how the Plan will affect them and regarding their best course of action with respect to the Plan.

This Disclosure Statement has been prepared in good faith and in compliance with applicable provisions of the Bankruptcy Code. Based upon information currently available, the Township believes that the information contained in this Disclosure Statement is correct as of the date of its filing. The Disclosure Statement, however, does not and will not reflect events that occur after the date of its filing in U.S. Bankruptcy Court (and, where indicated, specified earlier

Case 5:09-bk-02736-JJT    Doc 71    Filed 11/09/09    Entered 11/09/09 18:00:18    Desc
Main Document    Page 9 of 60

dates), and the Township assumes no duty and presently does not intend to prepare or distribute any amendments or supplements to reflect such events.

**B.    Summary Of Entities Entitled To Vote On The Plan And Of Certain Requirements Necessary For Confirmation Of The Plan.**

Holders of allowed claims in Class 2 (Dime Bank Claim) and Class 3 (Pennstar Bank Claims), (together, the "Voting Classes") are entitled to vote on the Plan, because such Classes may be "impaired" under the Plan within the meaning of section 1124 of the Bankruptcy Code. Holders of claims in Class 1 (Katz Claims), Class 4 (John Deere Claim), Class 5 (Robert A. Dombrosky Claim) and Class 6 (General Unsecured Claims) are deemed to have accepted the Plan because such claims are not impaired by the Plan.

The Bankruptcy Court may confirm the Plan only if at least one Class of impaired claims has voted to accept the Plan (without counting the votes of any insiders whose claims are classified within that Class) and if certain statutory requirements are met as to both nonconsenting members within a consenting Class and as to dissenting Classes (if any). A Class of claims has accepted the Plan only when at least one-half in number and at least two-thirds in dollar amount of the allowed claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by one or more of the Voting Classes, the Township will request that the Bankruptcy Court confirm the Plan in accordance with those portions of section 1129(b) of the Bankruptcy Code that are applicable to the Chapter 9 Case, which provisions permit confirmation by a process known as "cramdown" notwithstanding such rejection, if the Bankruptcy Court finds that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting Classes. Other sections of this Disclosure Statement provide a more detailed description of the requirements for acceptance and confirmation of the Plan.

## C. Voting Procedures, Balloting Deadline, Confirmation Hearing, And Other Important Dates, Deadlines, And Procedures.

### 1. Voting Procedures And Deadlines.

The Township has provided copies of this Disclosure Statement and ballots (which include detailed voting instructions) to all known holders of impaired claims in the Voting Classes. Those holders of an allowed claim in a Voting Class who seek to vote to accept or reject the Plan must complete a ballot and return it to the Court-appointed Ballot Tabulator — Susan Henry, Senior Paralegal, Pepper Hamilton LLP, 3000 Two Logan Square, 18th & Arch Streets, Philadelphia, PA 19103 (the "Ballot Tabulator") -- so that their ballots actually are received by no later than the Balloting Deadline (as defined below). Ballots do not constitute proofs of claim and must not be returned directly to the Bankruptcy Court.

All ballots must be completed, signed, returned to, and actually received by the Ballot Tabulator by not later than _____, 2010, at 4:00 p.m. Eastern Standard Time (the "Balloting Deadline"). Ballots received after the Balloting Deadline, and ballots returned directly to the Bankruptcy Court, may not be counted in connection with confirmation of the Plan.

### 2. Date Of The Confirmation Hearing And Deadlines For Objection To Confirmation Of The Plan.

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on _____, 2010, at _____ a.m. Eastern Standard Time in the Courtroom of the Honorable John J. Thomas, United States Bankruptcy Judge for the Middle District of Pennsylvania, Courtroom No. 2, Max Rosenn U.S. Courthouse, 197 South Main Street, Wilkes Barre, PA. The Confirmation Hearing may be continued from time to time by announcement in open Court without further notice.

Any objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the following entities so as to be <u>actually received</u> by no later than

_____, 2010: (a) James Muir, Chairman of the Westfall Township Board of Supervisors, Westfall Township Municipal Office, 102 LaBarr Lane, Matamoros, PA 18336, (b) Robert F. Bernathy, Esquire, Township Solicitor, Klemeyer Farley & Bernathy, LLC, 2523 Route 6, Suite One, Hawley, PA 18428, (c) Pepper Hamilton LLP, 3000 Two Logan Square, 18th & Arch Streets, Philadelphia, PA 19103 Attention: J. Gregg Miller, Esquire and Leon Barson, Esquire (the Township's Bankruptcy Counsel), (d) Eckert Seamans Cherin & Mellott, LLC, 600 Grant Street, 44th Floor, Pittsburgh, PA 15219 Attention: James H. Roberts, Esquire (the PA Act 47 Plan Coordinator), (e) Office of the U.S. Trustee, 228 Walnut Street, Suite 1190, Harrisburg, PA 17101 Attention: Anne K. Fiorenza, Assistant U.S. Trustee. Objections that are not timely filed and served may <u>not</u> be considered by the Bankruptcy Court.

### D. **Important Notice.**

The historical financial data relied upon in preparing the Plan and this Disclosure Statement is based upon the Township's books and records. Although certain professional advisors of the Township assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the Township and third parties, much of which has not been audited. *The professional advisors of the* Township *have not independently verified such information and, accordingly, make no representations or warranties as to its accuracy.* Moreover, although reasonable efforts have been made to provide accurate information, the Township does not warrant or represent that the information in this Disclosure Statement, including any and all financial information and projections, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

Case 5:09-bk-02736-JJT   Doc 71   Filed 11/09/09   Entered 11/09/09 18:00:18   Desc
Main Document     Page 12 of 60

No entity may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan. Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the Township or any other party, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of claims in the Chapter 9 Case.

### E.     Additional Information.

If you have any questions about the procedures for voting on the Plan, desire another copy of a ballot, or seek further information about the timing and deadlines with respect to confirmation of the Plan, please write to bankruptcy counsel for the Township as follows: J. Gregg Miller, Esquire or Leon Barson, Esquire, Pepper Hamilton, LLP, 3000 Two Logan Square, 18th & Arch Streets, Philadelphia, PA (facsimile: 215-981-4750). Please note that bankruptcy counsel for the Township cannot and will not provide creditors with any legal advice, including advice regarding how to vote on the Plan or the effect that confirmation of the Plan will have upon claims against the Township.

## II.     BACKGROUND INFORMATION

### A.     The Township, its Services, Operations and Land Use Planning

The Township is a Pennsylvania Second Class Township operating under the Second Class Township Code with a five member Board of Supervisors, a Township Secretary and appointed Treasurer, Engineer and Solicitor. The Township's population is 2,430 and it comprises 30 square miles. It contains 951 occupied homes or apartments, with 80% of those owner-occupied. The median home/condominium value is $188,000. The median household income (2007) is approximately $51,000.

## Public Safety

Police services are provided by the Eastern Pike Regional Police Department (the "Department") pursuant to a Regionalization Agreement, effective January 1, 2008, between the Township and the neighboring Borough of Matamoras. Pursuant to the Intergovernmental Cooperation Act, the Township and Borough appoint two representatives each to a regional police commission with a fifth member appointed by the other four members. The costs of the Department are initially shared equally between the Township and Borough with eventual apportionment to be made by population. The Police Chief reports to the Commission which is responsible for hiring and disciplining of officers and setting salaries and benefits. The Township's portion of the Department's cost is budgeted at $332,000 for 2009.

Fire and ambulance rescue services are provided by two volunteer fire companies operating out of three stations, one of which is a substation located at the municipal building site. The Township's-2009 Fire Safety budget is $20,000 from the General Fund and $126,000 from special fire protection millage.

## Public Works

The Township provides maintenance and repair, including repaving, and snow and ice control for its public roads and bridges and storm sewer and drain maintenance. Residential garbage services are provided directly to property owners by private contract. The Township's 2009 Public Works budget is $224,000. A portion of the Township's Public Works budget is funded with state liquid fuels funds.

## Utility Services

Most of the Township is served by private septic systems. The commercial properties along Highway 6/209 are served by public sanitary sewers with collection and treatment provided by the Westfall Township Municipal Authority whose members are appointed by the

Case 5:09-bk-02736-JJT   Doc 71   Filed 11/09/09   Entered 11/09/09 18:00:18   Desc
Main Document      Page 14 of 60

Township Supervisors. Water service is provided through private wells, although public water service is provided to the commercial sector by the Matamoras Municipal Authority. A part-time sewage enforcement officer is responsible for inspections of the residential on-lot septic systems. The officer reviews and inspects all new systems, special testing, demolitions and modifications.

## Code Enforcement

Two part-time employees are responsible for zoning ordinance and building code enforcement and administration.

## General Government

The Township Secretary is responsible for the day-to-day operation of the Township office. Legal services are provided by the appointed Solicitor, engineering services by an appointed engineering firm and treasurer services by an appointed Treasurer. Act 511 tax collection services are provided by contract with Berkheimer, and real property taxes are collected by an elected tax collector. Westfall's current assessed value is $42,502,290 and its current real property tax collection rate is 93%.

None of the Township's employees are represented by public labor unions.

## Planning and Open Space

In December, 2007, the Township and Matamoras Borough filed a joint application with Pike County under its Scenic Rural Character Preservation Program. The purpose of the application was to fund a Multi-Municipal Open Space, Greenways and Recreation Plan. At the same time, the Township and Borough applied to the same County program for funding for a Regional Comprehensive Plan, updating the Township's Comprehension Plan, dating back to 1997, and the Borough's Comprehensive Plan, dating back to the 1960's. The two County grant requests totaled $55,000. The Open Space Plan will eventually become part of the Regional

-8-

Comprehensive Plan. As part of the total funding for the two related projects, the Township and Borough also applied for Pennsylvania Department of Community and Economic Development ("DCED") LUPTAP funding in the amount of $30,000 and Pennsylvania Department of Conservation and Natural Resources (DCNR) funding in the amount of $30,000.

All of the grants were received and the projects are underway.

The comprehensive planning process will consider the following elements as mandated by the Pennsylvania Municipalities Planning Code:

- Statement of Community Development Objectives

- Land Use Plan

- Natural and Historic Resources Protection Plan

- Housing Plan

- Transportation Plan

- Community Facilities and Utilities Plan (including a Water Supply Plan)

- Statement of the Interrelationships Among the Plan's Components

- Statement of the Plan's Compatibility with Adjoining Municipalities and the County Comprehensive Plan

- Statement of Plan Implementation Strategies

The goals of the Open Space Plan are to promote smart growth and open space, conservation of natural features/resources and to protect historical features.

Both projects are being completed by a Joint Planning Committee with elected official representation from the Township and Borough.

A draft Comprehensive Plan has been completed and is available for public review and comment. As discussed in Section III. A. below, the Katz Settlement requires that the

-9-

Township's Comprehensive Plan fully incorporate the terms, rights, benefits and entitlements afforded the Katzes in agreements, ordinances and other documents referred to in the U.S. District Court order entered on August 25, 2009. To the extent necessary, the draft Comprehensive Plan must be revised to comply with this requirement. The Open Space Plan project is underway. The two municipalities intend to have both projects completed by the end of 2009 and the Comprehensive Plan, including the Open Space Plan, submitted to the two municipal planning and governing bodies for review and adoption.

Land Conservation

The Township and Borough also cooperated in the purchase and preservation in 2009 of 708 forested acres located in the Township. The purchase was consistent with the Pike County Open Space Plan, completed in 2008, and protects headwater areas for Bush Kill (Millrift) Creek, a Pennsylvania designated exceptional value watershed. The DCNR, Bureau of Forestry, the Pike County Scenic Rural Character Preservation Program, the Allerton Foundation and the Keystone Conservation Trust combined funding and expertise to make the $3.1 million purchase. The property will be managed by the Bureau of Forestry.

**B.     The Township's Operating Budget, Balance Sheet and Long Term Debt**

Operating Budget

<u>Revenues</u>

The Township's major General Fund revenue sources are real property tax, real estate transfer tax and the Local Services Tax. According to the Township's 2008 Municipal Annual Audit and Financial Report to DCED, these taxes comprised 73% of the Township's General Fund revenue with real property taxes ($602,000) comprising 75% of total tax revenue. The Township's 2009 budget levies 14 mills of real property tax for General Fund purposes and

special tax millages of 4.85 mills for debt service, 3 mills for fire protection and 2 mills for road

equipment, for a total of 23.85 mills. The Township does not levy an Earned Income Tax. Other

significant revenue sources include Liquid Fuels and Charges for Services (including permit

fees). The Township's General Fund budget for 2009 is $1,353,345.

Expenditures

The Township's three major General Fund expenditure categories are (1) General

Government, comprising mostly employee benefits, insurance, public utility services and Board

of Supervisor salaries; (2) Public Safety, comprising police services (provided jointly with

Matamoras Bordugh) and fire services (volunteer); and (3) Public Works including road master

and road crew salaries, fuel, and road maintenance/repair costs. In the Township's 2009 General

Fund Budget, General Government constitutes approximately 8% of expenditures while Public

Safety constitutes approximately 26% and Public Works 16.5%.

Balance Sheet/Long Term Debt

The Township's 2008 Municipal Annual Audit and Financial Report submitted to DCED

indicates a General Fund balance/retained earnings, as of December 31, 2008, of $530,638. The

2009 Operating Budget applied $90,971 of that balance as an "Interfund Operating Transfer"

revenue.

-11-

The Audit also indicates that the Township has the following long term debt obligations[2] as of December 31, 2008:

| Lender | Date | Maturity | Principal Amount | Balance | Purpose |
|---|---|---|---|---|---|
| Dime Bank | 2007 | 2029 | $2,000,000 | $2,000,000 | Sewer/Water Construction |
| Pennstar Bank | 2004 | 2009 | $60,000 | $10,708 | Equipment Purchase |
| Pennstar Bank | 2004 | 2009 | $130,000 | $34,764 | Road Fund |
| Pennstar Bank | 2008 | 2013 | $120,000 | $103,016 | Truck Purchase |

In 2007, the Township entered into a capital lease with John Deere in the amount of $25,542. The lease matures in 2011 and the outstanding balance is $20,075.

### Capital Budget

The Township's main capital investments are regular reconstruction/repaving of its public roads. The Projected Revenues and Expenditures set forth in Section IV. D. below project $0 in 2010, $78,000 in 2011 and $78,475 in 2012 for this purpose.

In addition, as discussed in Section III. A. below, the settlement of the Katz litigation obligates the Township to fund the construction and installation of a sewage pumping station on a 3.4 acre site owned by the Katzes and other family members. According to the Supervisors and Solicitor, the Township has entered into an agreement with the Westfall Township Municipal Authority pursuant to which the Authority has agreed to construct the sewage pumping station in 2010 and the Township has fulfilled its obligation to fund the cost of construction. The Katz settlement also obligated the Township to construct sewer and water

---

[2] See Section III. A. below for a discussion of how these obligations are addressed in the Township's Chapter 9 Bankruptcy Plan.

capacity to the development site. In 2007, the Township borrowed $2 million to complete that obligation.

The Township has scheduled funding of its long-term debt and its capital requirements as shown on Appendix IV A contained in Exhibit B to this Disclosure Statement. The schedule reflects the adjustments to the loan terms set forth in the Township's proposed Chapter 9 Bankruptcy Plan, the loan from the Municipal Authority of the Township of Westfall discussed below and the Township's decision to satisfy early the two Pennstar Bank loans due in 2009.

Financial Analysis

As discussed above, the Township currently carries a General Fund Operating Balance of approximately $440,000. The Township has generally balanced its operating budget and met its obligations with vendors and creditors on an annual basis. The Township's financial management system, combined with the resources offered by its Treasurer, functions well and provides the Township with accurate, current financial results. The only issue driving the Township into municipal distress, bankruptcy and Act 47 is its obligations to the Katzes as a result of the litigation and settlement described in Section III. A. below.

### C. The Events Precipitating the Chapter 9 Case: The Katz Litigation

Since the early 1990's David H. and Barbara D. Katz (the "Katzes") have been involved in litigation with the Township, centering on development of approximately 740 acres of land owned by the Katzes and other family members plus a separate parcel of 3.4 acres located in the Township (the "Katz Properties"). In 1999, the Katzes won a $7 million judgment against the Township. In 2001, the Katzes entered into an Equitable Settlement Agreement and Settlement Agreement/Release with the Township (the "ESA/SAR"), which became an order of the United States District Court for the Middle District of Pennsylvania ("U.S. District Court"), whereby the Katzes compromised the July 26, 1999 judgment plus Katzes' rights and entitlement to statutory

-13-

interest and litigated costs against the Township and pursuant to which the Township would serve the Katz Properties with central/public sewer and water capacity, services and systems in return for the Katzes compromising the $7 million judgment against it. In December 2003, after the Township failed to comply with the ESA/SAR, the Katzes filed an action for breach of contract. The U.S. District Court issued a Memorandum and Order, finding that the Township had failed to provide the required sewer and water capacity, services and systems and subsequently issued an August 2005 Order clarifying and defining the requirements under the ESA/SAR, giving the Township an eighteen (18) month extension to comply with them.

The August 2005 Order also provided that the Township's failure to comply with the ESA/SAR and/or the August 2005 Order would result in, among other things, the entry of a money judgment against the Township. Pursuant to the August 2005 Order, the Township Board of Supervisors (the "Supervisors") and the Katzes executed the Stipulated Judgment which the Katzes were to hold "until such time as there is a breach of the ESA/SAR and/or this Order when the Stipulation may be filed by Katz with the Court Clerk and Judgment will be entered by the Court for Katz" (August 2005 Order).

Claiming various breaches of the ESA/SAR and the August 2005 Order, the Katzes filed the Stipulated Judgment with the U.S. District Court on February 16, 2007. Pursuant to the Stipulated Judgment, the Katzes also filed a Motion for Litigation Costs and Expenses incurred to enforce the ESA/SAR. In response, the Township moved to set aside the Stipulated Judgment under Federal Rule of Civil Procedure 60(b). After a March 29, 2009 hearing, the U.S. District Court issued an order granting the Township's 60(b) motion and setting aside the Stipulated Judgment. Also denied was the Katzes' Motion for Litigation Costs and Expenses, without prejudice. On June 4, 2007, the Katzes timely appealed to the United States Court of Appeals for

the Third Circuit ("Third Circuit") requesting that the Stipulated Judgment be reinstated. The Third Circuit concluded, among other things, that the failure of the Township to secure a water service agreement guaranteeing Katz third-party beneficiary status was a breach of the ESA/SAR and the August 2005 Order. The Third Circuit reversed the U.S. District Court's decision and ordered the U.S. District Court to reinstate the Stipulated Judgment for the Katzes.

The Stipulated Judgment provided, among other things, for monetary damages of $14,193,646, plus interest compounded annually at a rate of 8% accruing from June 12, 2004, until the total amount is fully paid by the Township and collected by the Katzes. On September 5, 2008, the U.S. District Court reinstated the Stipulated Judgment that the Katzes had filed with the U.S. District Court Clerk on February 16, 2007. On November 4, 2008, the U.S. District Court entered another Judgment and Order against the Township and for the Katzes, awarding litigation costs and expenses in the additional amount of $492,477.73 with annual interest accruing at the statutory rate of 1.44% compounded annually until the total amount is fully paid. On August 1, 2008, the Third Circuit entered a Judgment against the Township and for the Katzes in the amount of $1,012.00, with annual interest accruing at the statutory rate of 2.3%.

As of the end of calendar year 2008, the Township had not paid the Katzes any of the money owed under these Katz judgments. In order to compel the Township to pay the amounts owed to the Katzes under the Katz judgments, the Katzes filed with the U.S. District Court a Motion for Order Compelling Township and the Supervisors to Pay Money Judgments. That Motion was filed on February 2, 2009 in the form of a Mandamus Motion.

On April 6, 2009, the Katzes and the Township entered into the Stipulation wherein it was agreed that the Township owed the Katzes for the Katz judgments, as of February 2, 2009,

the amount of $20,804,484.93. A hearing on the Mandamus Motion was scheduled for April 13, 2009. The Township filed its Voluntary Chapter 9 Bankruptcy Petition on April 10, 2009 in order to stay the mandamus litigation and to permit the Township to negotiate a reasonable settlement of the Katz Claims while under the protection of the U.S. Bankruptcy Court.

## III. THE TOWNSHIP'S CHAPTER 9 CASE

### A. Commencement and Administration of the Chapter 9 Case

The Township filed its Voluntary Chapter 9 Bankruptcy Petition on April 10, 2009. The Township retained Pepper Hamilton LLP as its bankruptcy counsel and Hanna, McGlone & Co. P.C. as its accountants. On May 27, 2009, the Katzes filed an Objection to the Township's Voluntary Chapter 9 Petition. Hearings were set by the Bankruptcy Court on the Objection, but postponed at the request of the Katzes and the Township to enable them to participate in settlement discussions. The Katzes and the Township were able to reach a settlement of all the pre-bankruptcy claims of Barbara and David Katz and their family members, Michael B. Katz and Daniel S. Katz (the "Katz Claims"), which was completely and fully contained in a U.S. District Court Order entered on August 25, 2009. The Katzes' objections to the Township's Chapter 9 petition were withdrawn.

Katz Settlement

Pursuant to the settlement reached between the Katzes and the Township, the Township was required to pay to the Westfall Township Municipal Authority the funds necessary to cause the construction and installation of an 18,000 gallon per day sewage pumping station (the "Sewage Pumping Station") on the 3.4 acre site in the Township owned by the Katzes and other family members. The Township paid $146,000 to the Authority in October, 2009, to satisfy this payment obligation. The settlement also imposes a series of related deadlines by which the

-16-

Sewage Pumping Station must be designed, necessary permits applied for and obtained, bids for materials, equipment and construction received, all necessary contracts awarded for construction and installation, and the Sewage Pumping Station placed into full operation. The settlement also required the Township to construct and provide specific sewer and water capacity to the development site.

As to the monetary portion of the settlement, the dollar amounts otherwise owed by the Township regarding the Katz Claims under the Katz judgments were set aside by the settlement and replaced with the amount of $6,000,000 without interest, payable over 20 years in 80 quarterly installments of $75,000 each, due and payable to the Katzes on March 31, June 30, September 30 and December 31 of each year beginning with the first payment being made by the Township on September 30, 2009. All payments are required to be made by wire transfer within seven (7) calendar days of each due date. If the Township fails to comply with the terms, obligations and duties of the settlement, then the monetary amount owed to the Katzes reverts to in excess of $21 million.

In addition, the settlement with the Katzes requires that the Township's comprehensive plan fully incorporate the terms, rights, benefits and entitlements afforded to the Katzes in the agreements, ordinances and other documents referred to in the U.S. District Court order entered on August 25, 2009.

The Chapter 9 Plan does not in any respect contradict or contravene the settlement embodied in the Court Order and/or the Stipulated Judgment, neither of which shall in any respect be imported by the Plan.

Case 5:09-bk-02736-JJT    Doc 71    Filed 11/09/09    Entered 11/09/09 18:00:18    Desc
Main Document    Page 24 of 60

Additional Township Financial Obligations Addressed in Chapter 9 Plan

Dime Bank

In 2007, the Township executed a note to Dime Bank in the principal amount of $2 million, evidencing a loan to fund sewer and water capacity construction as part of the Katz settlement. Pursuant to the Chapter 9 Plan, the Township's obligations to Dime Bank are suspended until April 10, 2010. The term of the loan is also to be increased by ten years beyond the original 2029 maturity date to 2039, with the interest rate remaining the same. The required periodic payments are to be reduced accordingly pursuant to a revised amortization schedule.

Pennstar Bank

| Date | Original Maturity | Original Principal Amount | Balance at Bankruptcy | Purpose |
|------|-------------------|--------------------------|-----------------------|---------|
| 2004 | 2009 | $ 60,000 | $ 10,708 | Equipment |
| 2005 | 2009 | $ 130,000 | $ 34,764 | Road Fund |
| 2008 | 2013 | $ 120,000 | $ 103,016 | Truck |

Pursuant to the proposed Chapter 9 Plan, the $120,000 truck loan term will be extended to 2016 and the amount due deemed to be $103,016 (current balance: $91,752). The terms of the remaining two loans will not be extended, although the Township's Treasurer paid the balances in October, 2009. The required periodic payments on the truck loan are to be adjusted accordingly pursuant to a revised amortization schedule.

John Deere

In 2007, the Township entered into a capital lease with John Deere in the amount of $25,542. Pursuant to the Chapter 9 Plan, the claim is deemed to be an amount of $20,075 and the Township is obligated to bring payments current and keep current thereafter until the debt is paid in full in 2011.

-18-

Robert A. Dombrosky Claim

Robert Dombrosky is a former Westfall Township police officer who went on leave in August, 2007, after being charged with criminal offenses in New York State. Mr. Dombrosky was later acquitted in New York court, and he claims that the Township promised to reinstate him with back pay, if he were acquitted. The Township disputes the claim. The Chapter 9 Plan provides that the claim holder retains rights in any property in which Dombrosky held a valid and perfected pre-bankruptcy security interest, and that to the extent the claim exceeds the value of any Dombrosky collateral in place, the claim will be a general unsecured claim. Mr. Dombrosky has filed an objection to the Township's Chapter 9 petition. However, his claim is not impaired under the Chapter 9 Plan.

**B.    The PA Act 47 Recovery Plan**

Pursuant to the Pennsylvania Municipalities Financial Recovery Act, Act 47 of 1987 ("Act 47"), as amended, and the accompanying regulations of the Commonwealth's Department of Community and Economic Development (the "Department" or "DCED"), a municipality which files a municipal debt adjustment action under federal law "shall be deemed to be a financially distressed municipality under the act." Act 47, § 262(a). On April 14, 2009, upon receipt and review of the Township's Chapter 9 bankruptcy petition, DCED Secretary George E. Cornelius ordered that the Township be deemed to be a distressed municipality under Act 47. By letter dated May 11, 2009, the Secretary appointed Eckert Seamans Cherin & Mellott, LLC as the Recovery Plan Coordinator (the "Coordinator") for the Township.

Act 47 further requires that the Coordinator formulate an Act 47 Recovery Plan in cooperation with the bankruptcy court. Specifically, the Township is charged with utilizing the procedures set up under Act 47 "concurrently with the processing of the Federal action, so as to

efficiently expedite the formulation of a plan, its timely confirmation by the Federal court having jurisdiction of the Federal action and its adoption by ordinance." Act 47, § 263(b).

On August 18, 2009, the Coordinator filed a Motion To Intervene in the Township's Chapter 9 bankruptcy case in order to fulfill its responsibilities under Act 47. The Bankruptcy Court granted the motion.

On August 25, 2009, the Coordinator toured the Township with Supervisor Buchanan, who outlined the extent and mode of delivery of public services offered by the Township, and then met with the Chairman of the Board of Supervisors, James Muir, Supervisors Buchanan and Fischer, Solicitor Robert F. Bernathy, Township Secretary Lisa Green and Matthew P. Domines, Local Government Policy Specialist, DCED. The discussion included the Act 47 Recovery Plan process, the basic content of the Recovery Plan, the process required to combine the Act 47 Recovery Plan with the Bankruptcy Court Chapter 9 Plan, and the Township's options to raise the tax revenue required to meet its ongoing financial obligations and those additional obligations set forth in the Chapter 9 Plan.

Following further discussions with the Township Solicitor, Robert F. Bernathy, and the Township Treasurer, Scott Myer, and the Coordinator's review of Township audits, budgets, Bankruptcy Court pleadings and schedules and other information, the Coordinator filed the Recovery Plan with the Township Secretary on September 29, 2009. On that same date, the Township's bankruptcy counsel filed a draft Chapter 9 Plan for public review with the Township Secretary.

On October 19, 2009, the Coordinator held a public meeting in the Township, pursuant to Section 242(e) of Act 47, to receive public comment on the Recovery Plan. Based upon further discussions with the Township Supervisors and staff, the Coordinator filed a revised Plan with

the Township on October 29, 2009. A copy of the Recovery Plan is attached as Exhibit A to the Chapter 9 Plan. The Township will request the Bankruptcy Court to confirm both plans at the Confirmation Hearing in this case.

Goals of the Recovery Plan and the Chapter 9 Plan

The Township has historically balanced its operating budget and met its obligations to vendors and creditors on an annual basis. The only issue driving the Township into municipal distress, bankruptcy and Act 47 is its obligations to the Katzes resulting from the litigation and settlement described in Section III. A.

In order to meet its cash and sewage pumping station construction obligations to the Katzes, the Township Supervisors have decided to levy a special property tax millage (the "Katz Tax") at the rate of 11.35 mils for 2010. The Township contemplates reducing that special tax millage in 2011 to 7.5 mils to reflect the expected completion of funding for, and construction of, the sewage pumping station by the end of 2010. The Recovery Plan requires that the Township levy the Katz Tax at rates sufficient, from year to year, beginning in 2010, to satisfy its obligations to the Katzes.

The Revenue and Expenditure projections for 2010-2012 set forth in Section IV. D. below project that with these new or increased tax levies, the Township will meet its obligations to the Katzes, and to its vendors and creditors, and generate small, positive operating balances in each year.

The goal of the Recovery Plan is to assure the Township's initiation of compliance with its obligations to the Katzes in 2010, 2011 and 2012 and to return the Township to the generation of a positive annual operating balance by at least 2012. If these goals are met, the Township

-21-

should be able to satisfy the conditions set forth in Section 253 of Act 47 and to exit the Pennsylvania Distressed Municipalities Program by the end of 2012.

## IV.    THE TOWNSHIP'S FISCAL PLANS FOR THE ADJUSTMENT AND PAYMENT OF ITS DEBT

### A.    Tax Increases

In order to meet its obligations to the Katzes and others, the Township Supervisors have decided to levy a special real property "Katz Tax" at the rate of 11.35 mils in 2010, reduced to 7.5 mils in 2011 and 2012. In order to meet its other ongoing obligations, the Supervisors will petition the Pike County Court of Common Pleas for authority to increase its 2010 General Fund millage to 15.6 and plan to repeat that request in 2011 and 2012. The Supervisors also intend to reduce the 2010 Fire Protection special millage to 1 and the Capital Road Projects special millage to 0. The Fire Protection millage is projected to increase to 1.8 mils in 2011 and 2012, The Capital Road Projects millage is projected to increase to 1.9 mils in 2011 and 2012. Hence, the Township's total millage will increase in 2010, 2011 and 2012 to 31.2 from the 2009 total millage of 23.85.

The Recovery Plan requires the Township to levy the real property tax rates listed above for 2010 and to continue to levy taxes at the rates required to meet its obligations to the Katzes and its other vendors and creditors and to complete its capital budget discussed herein.

### B.    Borrowings to Assist Cash Flow

As a result of increased legal fees tied to the Katz litigation and related bankruptcy proceedings, the payments to Katz and construction obligations required as part of the settlement, the Township is projected to incur a cash flow deficit in December 2009 of approximately $71,725. To address this cash flow deficit, the Township intends to borrow $125,000 from the Municipal Authority of the Township of Westfall before the end of 2009.

The loan will be payable in three annual payments of one-third of the total loan amount, plus interest, on or before June 1, 2011, 2012 and 2013. Taking this loan into account, the Township's Treasurer projects a cash shortfall at the beginning of 2010 of approximately $16,000, growing to a peak of approximately $148,500 in March, 2010. The Township intends to address the projected 2010 cash shortfall with the balance of the Authority loan, allocation of its operating balance, transfer of other available funds, and by issuing a tax anticipation note in early 2010 to a local bank in the approximate amount of $150,000. The note will be satisfied before the end of 2010. The Treasurer's current cash flow analysis is set forth in Exhibit B hereto as Appendix IV B.

### C. Fiscal Initiatives

In order to fulfill the Township's obligations under the Katz settlement, the Chapter 9 Plan and the Recovery Plan, the Township's Board of Supervisors will undertake the following fiscal initiatives:

1. Effective January 1, 2010, the Board of Supervisors shall increase the real property tax millage from 23.85 to 31.2. In each year thereafter, the Board of Supervisors shall continue to levy taxes at the rates required to meet the Township's obligations to the Katzes, as set forth in the U.S. District Court's order entered on August 25, 2009 and as set forth in the Township's Chapter 9 Plan as approved by the U.S. Bankruptcy Court for the Middle District of Pennsylvania, and to its other vendors and creditors and to complete its capital requirements discussed herein. The Township shall satisfy its obligations to all its creditors and claimants as finally determined by the Bankruptcy Court in its confirmation of the Township's Chapter 9 Plan.

2. With specific reference to its obligations to the Katzes, effective January 1, 2010, as a portion of the total 31.2 mils levied in 2010, the Board of Supervisors shall levy a special

"Katz Tax" real property tax at the rate of 11.35 mils or at such other rate sufficient to fund the Township's cash and capital construction obligations to the Katzes. In each year thereafter, the Board of Supervisors shall continue to levy a special "Katz Tax" at the rates required to meet its obligations to the Katzes, as set forth in the U.S. District Court's order entered on August 25, 2009 and as set forth in the Township's Chapter 9 Plan as approved by the U.S. Bankruptcy Court for the Middle District of Pennsylvania. All funds collected as a result of the Katz Tax set forth above shall be segregated from other Township funds and deposited in a special fund entitled 'Katz Obligation" from year to year until the full satisfaction of the Katz obligations by the Township.

3.    For the years 2010, 2011 and 2012, the Township shall petition the Court of Common Pleas of Pike County, pursuant to the Second Class Township Code, for authority to levy General Fund millage at the rate of 15.6 mils, or such other rate in excess of 14 mils required to meet the Township's fiscal obligations.

4.    Before the end of 2009, the Township shall continue to pursue and complete a loan in the amount of $125,000 from the Municipal Authority of the Township of Westfall (or other lender) upon the terms and conditions set forth in this Recovery Plan.

5.    The Township shall proceed with an RFP for a Tax and Revenue Anticipation Note (TRAN) for 2010 to meet the cash flow requirements of the Township and to have the TRAN in place as early in 2010 as possible. Any such TRAN shall be in conformance with applicable law and shall be repaid before the end of the year of origin of the TRAN.

6.    Reflecting the Township's new and demanding financial obligations over the next few years, the Board of Supervisors shall be provided monthly financial statements at its regular

scheduled meeting, which shall list by line item and summary form the previous month and year to date revenues and expenditures along with a comparison to budgeted allocations.

7.      It is important that the Township regularly report its progress in implementing the Recovery Plan and the Chapter 9 Plan to the Coordinator. This, in turn, allows the Coordinator, as the agent of the Department to ensure that the Commonwealth is up-to-date on the status of implementation efforts. Therefore, the Township shall provide status reports to the Coordinator no less frequently than monthly during the period it remains in a distressed condition. These reports may be in written form or may take the form of periodic meetings solely for this purpose. Additional on-site and telephonic meetings involving the Coordinator and appropriate officials and employees will also be held on a regular basis to review implementation efforts and to aid in the overall implementation process. Further, the Township shall routinely provide the Coordinator with all data pertinent to the recovery effort. For example, the annual budget shall be sent to the Coordinator as soon as it is introduced by the Board of Supervisors and again upon its adoption. In addition, material management, administrative and financial decisions made by the Township – which may or may not relate directly to the Recovery Plan – shall also be promptly communicated to the Coordinator before a final decision is made by the Township management or Supervisors.

8.      In cooperation with Matamoras Borough, the Township shall complete and adopt its Regional Comprehensive Plan and Regional Open Space, Greenways and Recreation Plan.

9.      The Township's revised Comprehensive Plan shall fully incorporate the terms, rights, benefits and entitlements afforded to the Katzes in the agreements, ordinances and other documents referred to in the U.S. District Court's order entered on August 25, 2009.

### D.    Revenue and Expense Projections 2010-1012

The charts attached hereto as Exhibit B project the Township's revenues and expenditures, including debt and capital, for the years 2010-2012.

The revenue projections include the "Katz Tax" element of 11.35 mils of real property tax in 2010, reduced to 7.5 mils in 2011 and 2012.

The expenditure projections reflect the debt service on long term debt as shown in Appendix IV A of Exhibit B and the Township's capital projects and Katz capital obligations as discussed above. The 2011 and 2012 expenditure projections reflect historic increases of approximately 3% per year.

The projections for 2010, 2011 and 2012 project small annual operating balances or "Operating Reserve."

## V.    SUMMARY OF THE PLAN OF ADJUSTMENT

The discussion of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions set forth in the Plan and its exhibits, the terms of which are controlling. Holders of claims and other interested parties are urged to read the Plan and its exhibits, copies of which are attached to this Disclosure Statement as Exhibit A, in their entirety so that they may make an informed judgment regarding the Plan.

The Plan generally provides for the Township to use cash on hand, increased taxes and limited borrowings to pay (i) the reduced amount of the Katz Claims, which amount was approximately $21 million dollars pre-bankruptcy but has been reduced by settlement to $6.0 million payable without interest over 20 years; (ii) the secured obligations to Dime Bank and Pennstar Bank in full, but over extended periods of time that exceed the original loan terms; and (iii) the claims of unsecured creditors in full in cash.

## A.  Classification And Treatment Of Claims.

### 1.  Unclassified Claims.

Section II of the Plan governs the treatment of certain claims that are not classified into Classes under the Plan.

#### a.  Unpaid Administrative Claims.

Administrative Claims are claims for an administrative expense of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code.  Section 11.A. of the Plan provides that, except as provided in Section II.B. of the Plan with respect to Professional Claims or to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the Township or its agent will pay to each holder of an Allowed Administrative Claim, in full satisfaction, release and discharge of such claim, cash in an amount equal to such Allowed Administrative Claim on the later of the Effective Date and the date on which such claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable; *provided* that Administrative Claims (other than Professional Claims) that represent obligations incurred in the ordinary course of business of the Township (defined as "Ordinary Course Administrative Claims") will be paid in full and performed by the Township in the ordinary course of business in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

Throughout the course of the Chapter 9 Case, the Township has endeavored to satisfy the so-called administrative expenses as they became due.  Accordingly, the Township believes that most claims that otherwise would constitute Allowed Administrative Claims previously have been or will be satisfied in the ordinary course of business prior to the Effective Date. Nevertheless, because of normal delays in invoicing, not all of such claims will have been paid

-27-

by the Effective Date. Thus, the Township anticipates that it will have to pay some Administrative Claims on or after the Effective Date.

### b. Professional Claims.

Professional Claims are claims for approval of amounts paid or to be paid for services or expenses in the Chapter 9 Case or incident to the Plan.

Section II.B. of the Plan provides that, pursuant to section 943(a)(3) of the Bankruptcy Code, all Professional Claims must be approved by the Bankruptcy Court as reasonable and that, upon approval. the Township or its agent will pay to each holder of a Professional Claim, in full satisfaction, release and discharge of such claim, cash in an amount equal to that portion of such claim that the Bankruptcy Court approves as reasonable (except to the extent such claim previously has been paid or satisfied) on or as soon as reasonably practicable following the date on which the Bankruptcy Court order determining such reasonableness becomes a Final Order.

The Township has paid the fees of its bankruptcy counsel and its accountants, on a regular basis during the Chapter 9 Case. Invoices from the pre-bankruptcy dates of employment through October 31, 2009 are summarized as follows:

| Professional | Dates of Employment | Fees/Expenses Invoiced Through October 31, 2009 |
|---|---|---|
| Pepper Hamilton LLP (Bankruptcy Counsel to the Township) | August 2008 to present | $373,762.73 |
| Hanna McGlone & Co. (Accountants to the Township) | February 2009 to present | $45,816.65 |

c.    **Bar Date For Assertion Of Requests For Payment Of Administrative Claims (Other Than Ordinary Course Administrative Claims) And Professional Claims.**

Section II.C. of the Plan provides that all requests for payment or any other means of preserving and obtaining payment of Administrative Claims (other than Ordinary Course Administrative Claims) that have not been paid, released, or otherwise settled, and all requests for approval of Professional Claims, must be filed with the Bankruptcy Court and served upon the Township and the United States Trustee no later than thirty (30) days after the date on which the Notice of Effective Date is mailed pursuant the Plan.

*Any request for payment of an Administrative Claim (other than an Ordinary Course Administrative Claim), and any request for approval of a Professional Claim, that is not timely filed by that deadline will be forever barred, and holders of such claims will be barred from asserting such claims in any manner against the Township.*

2.    **Class 1 – Katz Claims.**

a.    **Impairment And Voting.**

Class 1 is not impaired by this Plan. The holders of Claims classified in Class 1 are not entitled to vote their Claims to accept or reject this Plan.

b.    **Treatment.**

The Township and the Katzes have arrived at a settlement agreement which is embodied in the form of Court Order attached to the Plan as Exhibit A, which in turn attaches a form of Stipulated Judgment (the "Court Order"). The principal term of the Katz settlement is the reduction of a pre-bankruptcy judgment held by the Katzes against Westfall Township in the amount of $20,804,485.00 to the following: $6.0 million payable in equal quarterly installments of $75,000 each for twenty (20) years, without interest. On August 25, 2009 the Court Order was entered by the United States District Court for the Middle District of Pennsylvania, thereby

settling all of the pre-bankruptcy monetary and non-monetary claims against the Township that were held by Barbara D. Katz, David H. Katz, Michael B. Katz and Daniel S. Katz, their heirs, executors, successors and assigns (the "Katz Claims"). The Township and the Katzes now agree that the jurisdiction for the enforcement of the obligations between the respective parties, including both monetary and non-monetary performance, shall lie exclusively with the United States District Court for the Middle District of Pennsylvania. The Chapter 9 Plan does not in any respect contravene the settlement embodied in the Court Order and/or the Stipulated Judgment, neither of which shall in any respect be impacted by the Plan. No provision of the Plan contradicts, nor is it intended to contradict, the Court Order and/or the Stipulated Judgment. The Township has stipulated with the Katzes that the automatic stay of any future bankruptcy proceeding will not stay enforcement of the Katz settlement.

### 3. Class 2 – Dime Bank Claim.

#### a. Impairment And Voting.

Class 2 is impaired by this Plan. The holder of the Claim classified in Class 2 is entitled to vote its Claim to accept or reject this Plan in accordance with the Plan Solicitation Order.

#### b. Allowance.

As of the Effective Date, the Dime Bank Claim shall be deemed to be an Allowed Secured Claim in the aggregate amount of $2 million.

#### c. Treatment.

On the Effective Date, the Township shall provide to the holder of the Allowed Secured Dime Bank Claim, the following treatment:

> **(i) The Dime Bank shall retain all of its legal, equitable, and contractual rights under the Dime Bank loan documents.**

(ii)　All liens and security agreements provided by the Dime Bank loan documents shall remain in place.

(iii)　Notwithstanding the foregoing (i) the Township's principal payment obligations to the Dime Bank shall be suspended until April 10, 2010, and (ii) the term of the loan shall be increased by 10 years beyond the expiration date set forth in the Dime Bank loan documents. The original expiration was in 2029, but it shall be extended to 2039. The interest rate shall remain the same as provided in the original loan documents (4.34% with the first scheduled change date in 9/2019). However, the periodic payments shall be reduced accordingly, and a new amortization schedule shall be provided.

In consideration for the distributions and other benefits provided under this Plan, the provisions of this Section shall constitute a good faith compromise and settlement of all claims or controversies relating to the validity, enforceability, existence, extent, attachment, perfection, and priority of any liens collateralizing the Dime Bank Claim and/or relating to the nature of the Dime Bank loan documents. The entry of the Confirmation Order shall constitute the approval by the Bankruptcy Court of such compromise and settlement and a determination that the compromise and settlement is fair, reasonable, and in the best interests if the Township and its creditors.

### 4.　Class 3 – Pennstar Bank Claims.

#### a.　Impairment And Voting.

Class 3 is impaired by this Plan. The holder of Claims classified in Class 3 is entitled to vote its Claims to accept or reject this Plan in accordance with the Plan Solicitation Order.

**b.      Allowance of Pennstar Bank Claims.**

As of the Effective Date, the Pennstar Bank Claims shall be deemed to be Allowed

Secured Claims in the following amounts (reduced by any payments made during the Chapter 9

case):

> (i)      **$103,016 (Loan re Sherwood Truck).**
>
> (ii)     **$ 10,708 (Loan re 2004 Equipment).**
>
> (iii)    **$ 34,764 (Loan re 2004 Road Fund).**

**c.      Treatment.**

On the Effective Date, the Township shall provide to the holder of the Allowed Secured

Pennstar Bank Claims, the following treatment:

> (i)      **The Pennstar Bank shall retain all of its legal, equitable, and contractual rights under the Pennstar Bank loan documents.**
>
> (ii)     **All liens and security agreements provided by the Pennstar Bank loan documents shall remain in place.**
>
> (iii)    **Notwithstanding the foregoing, the remaining term of one of the loans shall be extended beyond the expiration date set forth in the Pennstar Bank loan documents, as follows:**
>
> •        Loan re Sherwood Truck – Extend Term from 5/1/13 to 9/23/16.

**The terms of the Loans re 2004 Equipment and 2004 Road Fund shall not be extended, but shall be paid in full. The interest rate on the Loan re Sherwood Truck shall remain the same, but the periodic payments shall be reduced accordingly, and a new amortization schedule shall be provided.**

In consideration for the distributions and other benefits provided under this Plan, the

provisions of this Section shall constitute a good faith compromise and settlement of the Pennstar

Bank Claims and all controversies relating to the validity, enforceability, existence, extent,

attachment, perfection and priority of any liens collateralizing the Pennstar Bank Claims. The

-32-

entry of the Confirmation Order shall constitute the approval by the Bankruptcy Court of such compromise and settlement and a determination that the compromise and settlement is fair, reasonable, and in the best interests of the Township and its creditors.

### 5. Class 4 – John Deere Credit Claim.

#### a. Impairment And Voting.

Class 4 is not impaired by this Plan. The holder of the Claim classified in Class 4 is not entitled to vote its Claim to accept or reject this Plan.

#### b. Allowance.

As of the Effective Date, the John Deere Credit Claim shall be deemed to be an Allowed Secured Claim in the amount of $20,075 (reduced by any payments made during the Chapter 9 case).

#### c. Treatment.

On the Effective Date, the Township shall provide to the holder of the Allowed Secured John Deere Credit Claim, the following treatment:

> **(i)** **John Deere Credit shall retain all of its legal, equitable, and contractual rights under the John Deere Credit loan documents.**
>
> **(ii)** **All liens and security agreements provided by the John Deere Credit loan documents shall remain in place.**
>
> **(iii)** **All payment obligations shall be brought current as of the Effective Date and shall be kept current thereafter until the debt owed to John Deere Credit has been paid in full.**

6. **Class 5 – Robert A. Dombrosky Claim.**

a. **Impairment And Voting.**

Class 5 is not impaired by this Plan. The holder of the Claim classified in Class 5 is not entitled to vote its Claim to accept or reject this Plan.

b. **Treatment.**

On the Effective Date, the Township shall provide to the holder of the Secured Robert A. Dombrosky Claim, in full satisfaction, release and discharge of such Claim, the following treatment:

(i) **The holder of the Claim shall have all legal, equitable, and contractual rights in any property in which Robert A. Dombrosky held a valid, pre-bankruptcy security interest that was perfected more than 90 days prior to April 10, 2009, the bankruptcy filing date (the "Dombrosky Collateral").**

(ii) **All valid liens and security agreements, if any, held by Robert A. Dombrosky in the Dombrosky Collateral shall remain in place.**

(iii) **To the extent that Robert A. Dombrosky has a valid Claim that exceeds the value of any Dombrosky Collateral (the "Dombrosky Deficiency Claim"), such Dombrosky Deficiency Claim shall be a general unsecured claim in Class 6 – General Unsecured Claims under this Plan.**

c. **Amount.**

Mr. Dombrosky claims to be a partially secured creditor. His total claim is $33,687, of which $16,612 is alleged to be secured by an escrow account which Mr. Dombrosky alleges to be in the possession of the Township Solicitor. Westfall Township disputes the secured status and admits only that Mr. Dombrosky is an unsecured creditor in the amount of $16,612 based

-34-

solely on a pre-petition settlement offer that was made to his counsel, but not based on the substantive merits of his claim.

7. **Class 6 – General Unsecured Claims.**

a. **Impairment And Voting.**

Class 6 is not impaired by this Plan. The holders of Class 6 General Unsecured Claims are not entitled to vote such Claims to accept or reject this Plan.

b. **Treatment.**

On the Effective Date, the Township shall provide payment in cash to each holder of an Allowed Class 6 Claim in the full principal amount of such Allowed Claim, plus interest to the date of payment at the following rate, whichever is applicable: (i) the rate of interest, if any, provided by the contract between the holder of the Claim and the Township, or (ii) interest at the rate, if any, provided by applicable non-bankruptcy law.

c. **Amount.**

The total amount of unsecured claims is $25,830, without inclusion of any Dombrosky deficiency claim or the Katz judgment that has been settled.

B. **Treatment Of Executory Contracts And Unexpired Leases.**

1. **Generally.**

The Bankruptcy Code empowers debtors, subject to the approval of the Bankruptcy Court, to assume or reject the debtors' executory contracts and unexpired leases. An "executory contract" generally means a contract under which material performance other than the payment of money is due by the parties.

If an executory contract or unexpired lease is rejected by the debtor, the rejection operates as a prepetition breach of such agreement. If an executory contract or unexpired lease is assumed by the debtor, the assumption obligates the debtor to perform under the agreement, and

damages arising for any subsequent breach of the agreement are treated as administrative expenses.

As of the date of this Disclosure Statement, the Township believes that most of its remaining executory contracts probably are beneficial to it. The Township is reviewing its contracts to determine which remaining executory contracts should be assumed and which should be rejected pursuant to the Plan, each in the manner described below.

### 2. Assumption.

The Plan provides that any executory contracts or unexpired leases that (a) are not identified on the Schedule of Rejected Agreements (to be filed at a later date); (b) have not expired by their own terms on or prior to the Effective Date; (c) have not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court as of the Effective Date; and (d) are not the subject of a motion for rejection pending as of the Effective Date, will be deemed to have been assumed by the Township effective as of the Effective Date. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of and authorization for the assumption of such executory contracts and unexpired leases pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Township and all parties in interest in the Chapter 9 Case.

### a. Cure Payments.

The Plan provides that, as soon as practicable after and in no event later than thirty (30) days after the Effective Date, the Township will pay to each party to an executory contract or unexpired lease assumed pursuant to the Plan any monetary amounts required to he paid under section 365(b) of the Bankruptcy Code as a condition to assumption, unless the Township and such party agree to different arrangements for the satisfaction of obligations under section

-36-

365(b). The Bankruptcy Court will retain jurisdiction to and, after the provision of notice and the opportunity for a hearing in accord with the Bankruptcy Rules, will resolve all disputes regarding (i) the amount of any cure payment to be made pursuant to the Plan: (ii) the ability of the Township to provide "adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code under the contract or lease to be assumed; and (iii) any other matter pertaining to such assumption.

### b. Bar Date for the Assertion of Claims for Cure Payments.

The Township does not believe that any amounts are necessary to be paid in order to cure any existing defaults or arrearages under the executory contracts and unexpired leases to be assumed pursuant to the Plan. **Any party to such an executory contract or unexpired lease that asserts that any payment or other performance is due in connection with the proposed assumption of such agreement in accordance with the Plan must file with the Bankruptcy Court and serve upon the Township a written statement and accompanying declaration in support thereof specifying the basis for its claim within the same deadline and in the manner established for filing objections to confirmation of the Plan. *See* Section 1.C.2. The failure to timely file and serve such a statement will waive any and all objections to the proposed assumption and any claim for cure amounts of the agreement at Issue.**

### 3. Rejection.

The Plan provides that any executory contracts or unexpired leases of the Township identified on the Schedule of Rejected Agreements or in any motion for rejection pending as of the Effective Date will be deemed to have been rejected by the Township as of the Effective Date, and the Township will have no liability under such executory contracts and unexpired Leases except specifically provided in the Plan. Subject to the occurrence of the Effective Date,

#11351892 v2
Case 5:09-bk-02736-JJT    Doc 71    Filed 11/09/09    Entered 11/09/09 18:00:18    Desc
                          Main Document    Page 44 of 60

entry of the Confirmation Order by the Bankruptcy Court will constitute approval of and

authorization for the rejection of such executory contracts and unexpired leases pursuant to

section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such

rejection is in the best interest of the Township and its creditors.

### a. Deadline For The Assertion Of Rejection Damage Claims; Treatment Of Rejection Damage Claims.

**All proofs of claim arising from the rejection of executory contracts or unexpired**

**leases pursuant to the Plan must be filed with the Bankruptcy Court and served on the**

**Township no later than thirty (30) days after the date on which the Notice of Effective Date**

**is mailed. Any claim for which a proof of claim is not filed and served within such time will**

**be forever barred and will n***ot be enforceable against the Township or its assets, properties,*

*or interests in property.* Unless otherwise ordered by the Bankruptcy Court, all such claims that

are timely filed as provided herein will be treated as General Unsecured Claims and be classified

into Class 6 under the Plan.

### C. Means For Execution And Implementation Of The Plan.

#### 1. Cash On Hand, Increased Taxes and Borrowings.

The Township's payment obligations under the Plan will he satisfied from unrestricted

funds available to the Township on and after the Effective Date, including cash on hand,

increased taxes and borrowings as described in Section IV above.

#### 2. Preservation Of Rights Action.

The Plan provides that, following the Effective Date, the Township may, pursue, litigate,

compromise and settle any and all "Rights of Action" without further notice, the opportunity for

a hearing, or Court approval. Notwithstanding the foregoing, the Township waives its rights to

pursue any avoidance or recovery actions under sections 544, 545, 547, 548, 549 and 550 of the

#11351897 v2
Case 5:09-bk-02736-JJT    Doc 71    Filed 11/09/09    Entered 11/09/09 18:00:18    Desc
                          Main Document    Page 45 of 60

Bankruptcy Code, except that the Township reserves the right to assert such Rights of Action in defense, setoff or recoupment, and except that the Township reserves the right to avoid the alleged security interest of Mr. Dombrosky.

The failure to list any potential or existing Right of Action generally or specifically in the Disclosure Statement is not intended to and shall not Limit the rights of the Township to pursue any such action. Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in the Plan, the Township expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including without limitation the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Rights of Action upon or after the confirmation or consummation of the Plan or the Effective Date. In addition, the Township expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the Township is a defendant or an interested party.

### 3. Cancellation Of Liens.

The Plan provides that, except as otherwise provided in the Plan, on the Effective Date any lien or security interest securing any Secured Claim shall be deemed released, and the entity holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Township (including without limitation any cash collateral) held by such entity and to take such actions as may be requested by the Township to evidence the release of such lien, including without limitation the execution, delivery and filing or recording of such releases.

### 4. Authorization.

The Plan provides that each of the officials and employees of the Township is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other

#11351897 v2
Case 5:09-bk-02736-JJT    Doc 71    Filed 11/09/09    Entered 11/09/09 18:00:18    Desc
                          Main Document        Page 46 of 60

agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and provisions of the Plan.

### D. Distributions.

On or after the Effective Date, the Township may retain one or more agents to perform or assist it in performing the distributions to be made pursuant to the Plan, which agents may serve without bond. The Township may provide reasonable compensation to any such agent(s) without further notice or Court approval. All distributions will be made at the address of the claim holder as set forth in the List of Creditors or in the books and records of the Township or its agents, unless the Township has been notified to send distributions to a different address by such holder in a writing that contains an address for such holder different from the address reflected in such List of Creditors for such holder.

### 1. Undeliverable Distributions.

***Holding of Undeliverable Distributions.*** If any distribution is returned to the Township or its agent as undeliverable, no further distributions will be made with respect to the claim for which such distribution is made unless and until the Township is notified in writing of the claim holder's then-current address. Unless and until the Township is so notified, such distribution shall be deemed to be "Unclaimed Property."

***Unclaimed Property.*** If any entity entitled to receive distributions pursuant to the Plan does not present itself on the Effective Date or on such other date on which such entity becomes eligible for distribution, such distributions will be deemed to be "Unclaimed Property." Unclaimed Property shall he set aside and held in a segregated account to be maintained by the Township pursuant to the terms of the Plan. On the first anniversary of the Effective Date, the Township will file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of holders of the Unclaimed Property.

#11351892 v2

The Township, however, otherwise will not be required to attempt to locate any such entity. On the second anniversary of the Effective Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon shall be remitted to and vest in the Township.

### 2. Timeliness Of Payments.

Any payments or distributions to be made pursuant to the Plan will be deemed to be timely made if made within fourteen (14) days after the dates specified in the Plan. Whenever any distribution to be made under the Plan will be due on a day other than a Business Day, such distribution instead will he made, without interest, on the immediately succeeding Business Day, but will be deemed to have been made on the date due.

### 3. Compliance With Tax Requirements.

The Township will comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or withholding is required, the Township will file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the Township, the Township, at its sole option, may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

### 4. Time Bar To Cash Payments.

Checks issued by the Township on account of allowed claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Township by the holder of the allowed claim with respect to which such check originally was issued. Any claim in respect of such a voided check must be made on or before the second anniversary of the Effective Date. After such date, all claims in respect of voided checks will he discharged and forever barred and the Township will retain all moneys related thereto.

### 5. No Distributions On Account Of Disputed Claims.

No distributions will be made on account of any disputed claim until such claim becomes allowed (and then only to the extent so allowed). Distributions made after the Effective Date in respect of claims that were not allowed as of the Effective Date (but which later became allowed) will he deemed to have been made as of the Effective Date.

### E. Disputed Claims.

### 1. Claims Objection Deadline; Prosecution Of Objections.

The Township will have the right to object to the allowance of claims filed by the claim holder with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part. Unless otherwise ordered by the Bankruptcy Court, the Township must file and serve any such objections to claims by not later than one hundred and eighty (180) days after the Effective Date (or, in the case of claims lawfully filed after the Effective Date, by not later than one hundred and eighty (180) days after the date of filing of such claims).

## 2. Reserves, Payments, And Distributions With Respect To Disputed Claims.

At such time as a disputed claim becomes an allowed claim, in whole or in part, the Township or its agent will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under this Plan. Such distributions, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such disputed claim becomes a Final Order (or such other date as the claim becomes an allowed claim), but in no event more than thirty (30) days thereafter. Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, no interest will he paid on Disputed Claims that later become Allowed Claims.

### F. Continuing Jurisdiction Of The Bankruptcy Court

The Plan provides for the Bankruptcy Court to retain jurisdiction over a broad range of matters relating to the Chapter 9 Case, the Plan, and other related items. Readers are encouraged to review Section XI of the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing post-Effective Date jurisdiction.

## VI. CONFIRMATION AND EFFECTIVENESS OF THE PLAN

**Because the law with respect to confirmation of a plan of adjustment is complex, creditors concerned with issues regarding confirmation of the Plan should consult with their own attorneys and financial advisors.** The following discussion is intended solely for the purpose of providing basic information concerning certain confirmation issues. The Township cannot and does not represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court may confirm the Plan. Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan

#11351897 v2

by the requisite number of creditors, and whether the Plan is in the "best interests" of creditors. These requirements, however, are not the only requirements for confirmation, and the Bankruptcy Court will not confirm the Plan unless and until it determines that the Plan satisfies all applicable requirements, including requirements not referenced in this Disclosure Statement.

### A. Voting And Right To Be Heard At Confirmation.

#### 1. Who May Support Or Object To Confirmation Of The Plan?

Any party in interest may support or object to the confirmation of the Plan. Even entities who may not have a right to vote (e.g., entities whose claims are classified in an unimpaired Class) may still have a right to support or object to confirmation of the Plan. *(See* Section I.C. for information regarding the applicable deadlines for objecting to confirmation of the Plan).

#### 2. Who May Vote To Accept Or Reject The Plan?

A creditor generally has a right to vote for or against the Plan if its claim is both "allowed" for purposes of voting and classified into an impaired Class.

***Allowed Claims For Voting Purposes.*** As noted above, a creditor's claim must be "allowed" for purposes of voting in order for such claim or interest to have the right to vote on the Plan. Generally, for voting purposes, a claim is deemed "allowed" for voting purposes if (a) a proof of claim was timely filed, or (ii) if no proof of claim was filed, the holder of the claim is identified in the List of Creditors as other than "disputed," "contingent," or "unliquidated." In either case, when an objection to a claim has been filed, the claimant cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes. Thus, **the definition of "Allowed Claim" used in the Plan for purposes of determining whether creditors are entitled to receive distributions are different from those used by the Bankruptcy Court to determine whether a particular claim is "allowed" for purposes of voting. Holders of claims are advised to review the definitions of**

-44-

"Allowed," "Claim," and "Disputed" set forth in Section I of the Plan to determine whether they may be entitled to receive distributions under the Plan.

*Impaired Claims.* As noted above, the holder of a claim has the right to vote on the Plan if that claim is allowed and classified in a Class that is *impaired* under the Plan. A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class with respect to their claims or interests. The Township believes that Classes 2 and 3 are impaired under the Plan. Any party that disputes such characterization, however, may request that the Bankruptcy Court find that its claim is impaired in order to obtain the right to vote on the Plan.

### 3. Who is Not Entitled To Vote?

The holders of the following types of claims are not entitled to vote on the Plan: (a) claims that have been disallowed; (b) claims that are subject to a pending objection and which have not been allowed for voting purposes; (c) claims that are not impaired; and (d) claims entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code (defined as "Administrative Claims"). Holders of Administrative Claims are not entitled to vote because such claims are not placed in Classes and are required to receive certain treatment specified by the Bankruptcy Code.

### 4. Votes Necessary To Confirm The Plan.

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class; and (b) either all impaired Classes have voted to accept the Plan, or the Plan is eligible to be confirmed by "cramdown" with respect to any dissenting impaired Class, as discussed below.

A Class of claims is considered to have accepted the Plan when more than one-half in number and at least two-thirds in dollar amount of the claims that actually voted in that Class have voted in favor of the Plan.

**B.      The "Best Interests" Test.**

The Bankruptcy Court also must determine that the Plan is in the "best interests of creditors" pursuant to section 943(b)(7) of the Bankruptcy Code.

There are very few authorities on what constitutes the "best interests of creditors" under chapter 9 of the Bankruptcy Code. One leading commentator notes that the proposed plan must be better than the alternative available to creditors: "In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race **to** obtain the mandamus remedy and to collect the proceeds. Clearly, such a result is chaos, especially in those cases where the debt burden of the municipality is too high to support the taxes that the lands of the municipality will bear or the taxes or fees that the inhabitants or the users of municipal services will pay." *See* 6 <u>Collier on Bankruptcy</u> ¶ 943.03[a] (15th ed. rev. 2002).

The Township submits that the Plan is in the best interests of all creditors because it provides for the full payment of all allowed claims other than (i) those for which the holders voluntarily have agreed to a different treatment (the Katz Settlement), or (ii) those who will vote to accept the Plan (Classes 2 and 3, the Dime Bank and Pennstar Bank). In contrast, in the absence of the Plan, the Township's creditors would be left, in the words of the treatise, to "fend for themselves." Moreover, while the Plan preserves the Township's ability to provide basic services to its residents, the alternative of continuing the Katz litigation through the collection phase would jeopardize the Township's ability to operate and provide even critical health and welfare services, to the severe detriment of the Township's residents, community, and ongoing creditors.

-46-

## C. Feasibility.

Section 943(b)(7) of the Bankruptcy Code also requires that the Plan be feasible. There also is limited authority as to what feasibility means in the context of a chapter 9 case. <u>Collier</u> notes that the "feasibility" standard means that "the debtor must demonstrate its ability to make the payments required under the plan and still maintain its operations at the level that it selects as necessary to continued viability of the municipality." 4 <u>Collier on Bankruptcy</u> ¶ 943.03[b] (15th ed. rev. 2002).

The Township's obligations under the Plan will be funded from cash on hand, increased taxes and borrowings, as described in Section IV above. The Township believes that, as a result, it will be able to make all payments required pursuant to the Plan while maintaining its operations at the level that is necessary to continued viability of as a municipality and that, as a result, the Plan is feasible within the meaning of section 943(b)(7).

## D. "Cramdown."

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired Class of claims accepts the Plan and the so-called "cramdown" provisions set forth in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (a) is "fair and equitable" and (b) does not discriminate unfairly with respect to each Class of claims that is impaired under and has not accepted the Plan.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting Class of claims receives payment in full for its allowed claim, no holder of allowed claims in any Class junior to that Class may receive or retain any property on account of such claims. The "fair and equitable" standard also has been

-47-

interpreted to prohibit any Class senior to a dissenting Class from receiving under a Plan more than 100% of its allowed claims. The Township believes that the Plan satisfies the "fair and equitable" standard because, among other things, no classes junior to the class of unsecured claims are receiving or retaining any property under the Plan, and the class of unsecured claims is receiving payment in full.

The requirement that the plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The Township does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

As noted above, the Township has reserved the right to request the Bankruptcy Court to confirm the Plan by "cramdown" in accordance with sections 1129(b)(1), (b)(2)(a) and (b)(2)(b). The Township also has reserved the right to modify the Plan to the extent, if any, that confirmation of the Plan under sections 943 and 1129(b) of the Bankruptcy Code requires such modification.

E.    **Effective Date.**

1.    **Conditions To The Occurrence Of The Effective Date.**

The Plan will not become effective and operative unless and until the Effective Date occurs. Section XII of the Plan sets forth certain conditions to the occurrence of the Effective Date, which conditions generally are waivable by the Township in its sole discretion without further notice of approval of the Bankruptcy Court.

One important condition to the Effective Date is that the Confirmation Order shall have become a Final Order and shall be in full force and effect. Another condition to the Effective Date is that the Township must receive all signed agreements and instruments, if any, that the Township deems necessary for the Plan.

-48-

The Effective Date will occur on the first Business Day after which the conditions set forth in Section XII of the Plan are satisfied or waived; *provided* that the Effective Date must occur by no later than December 31, 2010.

**F.      Effect Of Confirmation.**

Section X of the Plan provides that confirmation of the Plan and the occurrence of the Effective Date will have a number of important and binding effects, some of which are summarized below.  Readers are encouraged to review Section X of the Plan carefully and in its entirety to assess the various consequences of confirmation of the Plan.

**1.      Discharge Of The Township.**

Pursuant to section 944 of the Bankruptcy Code, on the Effective Date the Township will be discharged from all debts (as defined in the Bankruptcy Code) of the Township and claims against the Township other than (a) any debt specifically and expressly excepted from discharge by the Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the confirmation of the Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

The rights afforded in the Plan and the treatment of claims will be in exchange for and in complete satisfaction, discharge and release of all claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses incurred thereon from and after the petition date, whether against the Township or any of its properties, assets, or interests in property.  Except as otherwise provided in the Plan, on the Effective Date, all claims against the Township will be and will be deemed to be satisfied, discharged and released in full.  This discharge will not impair enforcement of the Court Order that embodies the settlement of the Katz Claims.

#11351897 v2
Case 5:09-bk-02736-JJT    Doc 71    Filed 11/09/09    Entered 11/09/09 18:00:18    Desc
                          Main Document    Page 56 of 60

## 2. Injunction.

Except as provided in the Plan, all entities who have held, hold or may hold pre-Effective Date claims will be permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such pre-Effective Date claim against the Township; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the Township with respect to such pre-Effective Date claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Township or its property or interests in property; and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Township with respect to any such pre-Effective Date claim, except as otherwise permitted by section 553 of the Bankruptcy Code. This injunction will not impair enforcement of the Court Order that embodies the settlement of the Katz Claims.

## 3. Term Of Existing Injunctions And Stays.

The Plan provides that all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

## VII. CERTAIN RISK FACTORS TO BE CONSIDERED

Holders of claims against the Township should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered with this Disclosure Statement and/or incorporated by reference, prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

-50-

## A.     Inability To Raise Tax Revenue.

As described in Section IV above, the Township's ability to make the payments that are required under the Katz settlement and pursuant to the Plan depends, in substantial part, on increasing tax revenue. Also, the Township's ability to continue to provide essential services could be jeopardized in the event that Township revenues ultimately are less than its required total obligations. In such a case, the Township might be forced to seek further protection under the Bankruptcy Code or otherwise attempt to further adjust its obligations. However, the Township has stipulated with the Katzes that the automatic stay of any future bankruptcy proceeding will not stay enforcement of the Court Order that embodies the settlement of the Katz Claims.

## B.     Reallocation of Revenue Away From The Township.

The state and federal governments control the amount and timing of some of the Township's revenue sources. There can be no assurance that the state and federal legislatures will not enact legislation resulting in reallocation of revenue away from the Township. Any such revenue reallocations could jeopardize the Township's ability to continue to provide essential services to its residents. In such a case, the Township might be forced to seek further protection under the Bankruptcy Code or otherwise attempt to further adjust its obligations.

## C.     Inability To Borrow.

While the Township currently believes that it will be to do able to do so, the Township can make no assurances that it will be able to consummate the borrowings to generate the funds to be used to make the payments as described in Section IV above.

#11351897 v2

## VIII.  CERTAIN TAX CONSEQUENCES

The implementation of the Plan may have federal, state, local or foreign income and franchise tax consequences to the holders of claims in the Chapter 9 Case. No rulings with respect to the federal, state, local or foreign tax consequences of the Plan will be sought or obtained. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. No tax opinion is intended to be given by this Disclosure Statement, and the description of tax consequences contained herein is provided for informational purposes only.

The Plan provides for the payment of certain claims. The effect of the payment likely will depend on the recipient's method of tax accounting. For example, if an accrual-basis taxpayer already has included the amount of the claim in income, the receipt of the payment will have no tax effect. By contrast, a cash-basis taxpayer will include the amount of the payment in income if the payment is compensation for the provision of goods or services.

**HOLDERS OF CLAIMS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

## IX.  RECOMMENDATION AND CONCLUSION

The Township believes that confirmation and implementation of the Plan is preferable to all other available and feasible alternatives. Accordingly, **the Township urges holders of impaired claims to vote to accept the Plan by so indicating on their ballots and returning them as specified in this Disclosure Statement and on their ballots**.

-52-

DATED: October 29, 2009

WESTFALL TOWNSHIP

By:_____
        Robert F. Bernathy
        Township Solicitor

Submitted By:

_____
J. Gregg Miller, Esquire
Leon R. Barson, Esquire
Bonnie M. Kistler, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Attorneys for Westfall Township, Debtor